UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERONICA GARDNER and CALVIN
MORGAN
on behalf of themselves and all others
similarly situated,

               Plaintiffs,

               v.

FLAGSTAR BANK, N.A.,

               Defendant.

_____/

Case No. 20-12061

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 105]

### I.    Introduction

On March 28, 2023, Plaintiffs Veronica Gardner and Calvin Morgan filed a Second Amended Class Action Complaint (the "SAC") "on behalf of themselves and all similarly situated consumers." See ECF No. 97. It names Flagstar Bank, FSB as the Defendant ("Defendant" or "Flagstar"). The Complaint alleges two Counts: breach of contract, including breach of the covenant of good faith and fair dealing ("Count I"); and conversion under MCL 600.2919(a) ("Count II").

Before the Court is Flagstar's Motion for Summary Judgment [ECF No. 105]. It was filed on June 22, 2023, and Plaintiffs responded on July 13, 2023 [ECF No. 110]. Flagstar replied on July 27, 2023 [ECF No. 120]. Gardner filed a supplemental brief on October 24, 2023 [ECF No. 132], and Flagstar responded on October 31, 2023 [ECF No. 133].

The Motion is fully briefed. Upon review of the briefing and applicable authority, the Court concludes oral argument will not aid in the resolution of this matter. Accordingly, the Court will resolve Defendant's Motion for Summary Judgment on the briefs. See E.D. Mich. L.R. 7.1(f)(2).

For the reasons set forth below, Defendants' Motion is granted.

## I.     Factual and Procedural Background

### A. Factual Background

Plaintiffs Morgan and Gardner opened respective checking accounts with Flagstar in 2010 and 2016. This relationship was governed by Account Agreement Documents (the "Agreement"), which include certain terms, conditions, definitions, policies, procedures, and a disclosure guide concerning Plaintiffs' accounts. See ECF No. 97-1. Pursuant to the Agreement, Flagstar also made continual updates to the disclosure guide. The relevant updates at issue in this litigation were appended to Plaintiffs' December 2017 account statements. ECF

No. 114-5, PageID.3562.

The Agreement contains various provisions regarding the assessment and payment of overdraft fees and insufficient funds fees (referred to by the parties as "OD/NSF Fees"). See ECF No. 97-1. Plaintiffs assert claims in connection with two related but distinct "fee maximization practices" that they attribute to Flagstar's assessment of OD/NSF fees.

The first alleged fee maximization practice encompasses Flagstar's policy of charging OD fees on "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions"), which is part of its "Bounce Back Protection Program."[1] ECF No. 97, PageID.1930. The Court will refer to Flagstar's practice of assessing OD fees on APPSN transactions as the assessment of "APPSN Fees." According to the affidavit of Taryn Barlow, Flagstar's Retail and Commercial Operations Director, an APPSN fee occurs when "everyday debit transactions" are authorized on an account with a positive available balance. ECF No. 105-5, PageID.2297. A temporary debit authorization hold is then placed on the account in an amount equal to the amount of the debit transaction, and the transaction is later presented for payment (or "settled") when the account's

---

[1] Under the Bounce Back Protection Program, Flagstar assesses a charge when it pays for a transaction made against an account with an Available Balance that is less than zero. ECF No. 97-1, PageID.1972. It is undisputed that Gardner and Morgan both consented to participate in the program for "everyday debit transactions."

available balance is negative due to intervening transactions that occur before the transaction is settled. *Id*.

The second practice pertains to Flagstar's policy of charging multiple NSF fees when an item is declined for payment due to an account's negative balance and the item is later presented for payment to the bank again. Flagstar charges an NSF fee each time the item is presented by a merchant and declined by the bank due to insufficient funds. ECF No. 97, PageID.1942. The Court will refer to this practice as "Item Presentment Fees". *Id*.

### B. Procedural Background

On August 23, 2021, the Court entered an Opinion and Order Granting in Part and Denying In Part Defendant's Motion to Dismiss (the "Opinion"). ECF No. 32. In the Opinion, the Court denied dismissal as to Plaintiff's breach of contract claim (count I) and granted dismissal as to Plaintiff's conversion claim (count II). With respect to the APPSN fees, the Court held that,

> [c]ontrary to Defendant's assertions, the Agreement is not unambiguously clear about whether an OD/NSF Fee may be assessed on an APPSN Transaction, and Plaintiff could reasonably understand the Agreement's terms to preclude Flagstar from assessing overdraft fees when the initial transaction is made with a positive account balance. . .

ECF No. 32, PageID.648. The Opinion found that the Agreement does not unambiguously describe the moment when an authorized transaction that exceeds

4

the Available balance becomes "paid" by Flagstar such that it causes an overdraft fee to occur. *Id*. Specifically, the Court determined that "the Agreement may be reasonably interpreted to mean that overdraft fees are assessed at the time of authorization, under Plaintiff's argument, or at the time of payment and settlement, under Defendant's argument." *Id*. PageID.649. Thus, "the instant matter present[ed] ambiguities about when OD/NSF Fees may be assessed in APPSN Transactions under the existing contractual language." *Id*. And because ambiguities existed, "dismissal of the breach of contract claim [wa]s improper." *Id*.

Regarding the Item Presentment Fees, the Court concluded that, "the Agreement's language . . . lends itself to two reasonable interpretations of 'item' and whether the Agreement permits multiple OD/NSF Fees on all presentments or resubmissions associated with a single transaction." *Id*. at PageID.655. Accordingly, "a contractual ambiguity" existed, "precluding dismissal of the breach of contract claim." ECF No. 32, PageID.655.

On the conversion claim, the Court noted that, "[b]ecause 'a tort action will not lie when based solely on the nonperformance of a contractual duty,' Plaintiff's conversion claim must therefore be dismissed." *Id*. at PageID.658 (quoting *Lossia v. Flagstar Bancorp, Inc*., No. 15-12540, 2016 WL 520867, at *3 (E.D. Mich. Feb. 10, 2016) (quoting *Fultz v. Union-Com. Assocs*., 470 Mich. 460, 466, 683 N.W.2d 587, 591 (2004))).

On December 13, 2023, the Court entered an Opinion and Order [ECF No. 134] denying Plaintiffs' previously filed Motion to Permit Calvin Morgan to Continue Litigating this Action on Behalf of D&C Enterprise Group, LLC. In the Opinion, the Court determined that Morgan did not have article III standing and thus could not litigate the case on behalf of D&C. *Id*., PageID.4406. Here, the Court relies on its rationale with respect to the standing requirements, as stated in its previous Opinion and Order [ECF No. 134]. It will grant the instant motion for summary judgment as to Morgan due to lack of standing. Accordingly, the analysis and applicable law below pertains solely to Defendants' motion for summary judgment on each of Gardner's claims.

## II.   Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). No genuine dispute of material fact exists where the record "taken as a whole[,] could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and identifying those portions of "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251– 52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether a genuine dispute of material fact exists, the Court "draw[s] all reasonable inferences and view[s] the evidence in the light most favorable to the [nonmovant]." *Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013).

## III.   Discussion

### A. Count I: Breach of Contract

In February 2016, Plaintiff Gardner opened a consumer checking account and signed an "account opening agreement" with Flagstar. The governing terms and conditions for the account were provided to Gardner upon opening the account. ECF No. 105-3, PageID.2241. Her claims pertaining to the APPSN fees stem from four APPSN transactions Gardner authorized in November 2019 that overdrew her account. ECF No. 105-9, PageID.2427-28. Flagstar paid the items and assessed OD fees. *Id*.

On the other hand, Gardner's claims regarding Item Presentment fees arise

from transactions that took place in December 2019. A merchant named Progressive Lease presented an ACH debit with the instruction to pay $86.13. Because Gardner's account had a negative balance, Flagstar rejected the transaction and charged an NSF fee to her account. The merchant presented this Item for payment a total of four times, and Gardner was charged four NSF fees as a result.

The issue before the Court is whether Gardner has sufficiently demonstrated that Flagstar breached the Agreement by assessing APPSN and Item Presentment fees. The Court will discuss both issues below.

### 1. Whether the Disclosure Guide Updates are Unlawful and Ineffective

As a reminder, the Court previously held that the Agreement was ambiguous. ECF No. 32, PageID.649, 655. Flagstar avers that the language of the updated disclosure guide removes the perceived ambiguity in the contractual language. ECF No. 105, PageID.2172. And Gardner maintains that the updated language is unlawful and ineffective for a variety of reasons. [2]

Gardner raises two arguments concerning the updated disclosure guide's purported ineffectiveness. She argues that: (a) "February 5, 2018 Language Is Not

---

[2] Gardner refers to the updated disclosure guide that was attached to her December 2017 account statement as the "Post- February 5, 2018 Language" because a clause in the agreement indicates that the updated disclosure guide would become effective after February 5, 2018.

Enforceable Against Plaintiffs Because It Does Not Comply With Regulation E[,]" 12 C.F.R. § 1005.17; and (b) "Even If Regulation E Did Not Exist, Notice of the February 5, 2018 Agreement Was Not Lawful and Thus No Contract Was Formed" ECF No. 110, PageID.2779-96. The Court will address each argument in turn.

### (a) Whether the Updated Language is Unenforceable due to noncompliance with Regulation E

Under 12 C.F.R. §1005.17(b)(1), i.e., Regulation E, a financial institution holding a consumer's account "shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution:"

    (i)    Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service;

    (ii)    Provides a reasonable opportunity for the consumer to affirmatively consent, or opt in, to the service for ATM and one-time debit card transactions;

    (iii)    Obtains the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one-time debit card transactions; and

    (iv)    Provides the consumer with confirmation of the consumer's consent in writing, or if the consumer agrees, electronically, which includes a statement informing the consumer of the right to revoke such consent.

Although Gardner undisputedly consented to the overdraft policy in a Regulation E form, she believes that Flagstar was required to obtain her consent "via a stand-

alone Opt-In Contract" for the updated disclosure guide to be "lawful." ECF No. 110, PageID.2778.

Claims for noncompliance with Regulation E may be brought under the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq*., and 12 C.F.R. §1005.17(b)(1). Because Gardner did not allege a Regulation E violation in her SAC, her claim fails. *See Spengler v. Worthington Cylinders*, 514 F. Supp. 2d 1011, 1017 (S.D. Ohio 2007) ("[A] plaintiff may not defeat summary judgment by asserting a claim that he did not plead in the complaint."); *See also* (*Tucker v. Union of Needletrades, Indus., and Textile Employees*, 407 F.3d 784, 787–88 (6th Cir.2005) (noting that, if discovery reveals a claim not previously raised, the plaintiff should seek to amend the complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure)); *Gilmour v. Gates, McDonald & Co*., 382 F.3d 1312, 1315 (11th Cir.2004) (holding that a plaintiff could not raise a new claim in response to a summary judgment motion); and *Bridgeport Music Inc. v. WM Music Corp*., 508 F.3d 394 (2007) (6th Cir. 2007) ("To the extent [plaintiff] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment or on appeal.").

Plaintiff did not seek amendment to plead an additional claim under Regulation E. Permitting Gardner to raise new claims and substantially different legal theories not discussed in the SAC would constitute unfair surprise. It would

allow Flagstar to file a reply brief with a short page limit as its only opportunity to respond. Therefore, the Court will not consider Gardner's Regulation E claim.[3]

### (b) Whether Notice of the February 5, 2018 Agreement Was Effective and Lawful

Gardner argues that Flagstar has not "presented any admissible evidence" as to whether it disseminated the disclosure guide updates to Plaintiffs. ECF No. 110, PageID.2787. The record refutes this argument because Flagstar submitted a declaration from its representative, Ms. Barlow, who was "involved in the revisions of the disclosure guides Flagstar provides to its customers when they open an account."[4] ECF No. 105-5, PageID.2292. Ms. Barlow declared that Flagstar "normally provides its customers with written notice of the updates [to the disclosure guide] by way of attachment to the customer's monthly account statement." *Id*., at PageID.2293. Flagstar also produced interrogatory responses stating that it mailed a paper copy of Plaintiff Gardner's December 2017 account

---

[3] For these reasons, the Court also declines to consider Gardner's unconscionability argument. The SAC does not give notice that unconscionability would be at issue. Additionally, Plaintiff's re-pleading of the dismissed Conversion claim is based on Regulation E. Therefore, the Court will grant summary judgment on Plaintiff's Conversion claim (Count II) as well.

[4] Gardner argues that Ms. Barlow lacks personal knowledge of whether or how the February 2018 Disclosure Guide Updates were sent to customers, and she believes Ms. Barlow's testimony on this point is inadmissible because Fed. R. Civ. P. 56(c)(4) requires that affidavits be made on personal knowledge. The Court rejects this argument because Ms. Barlow was involved in the revision process for the disclosure guide updates and her affidavit asserts that she has "personal knowledge of all the facts stated" therein. ECF No. 105-5, PageID.2292.

statement with the attached disclosure guide updates to Plaintiff Gardner's address of record. ECF No. 105-8, PageID.2388-90.

But these interrogatory responses "cannot support a summary judgment motion[,]" Gardner avers, "because[,] at the threshold level[,] it cannot even prove which method of dissemination—mail or email—applied to the account." ECF No. 110, PageID.2787. Though Flagstar now asserts that it mailed the updates to Gardner, its binding response to Plaintiff's Requests for Admission indicates that it emailed Gardner the disclosure guide updates. Thus, Gardner says, "[Flagstar's] attempts" to "contradict the[ir] admission with other evidence" creates "a genuine issue of material fact regarding which delivery method, if any, was used with respect to Plaintiff Gardner." ECF No. 110, PageID.2788.

The Court disagrees, the fact that Flagstar produced evidence to demonstrate that it mailed the December 2017 account statement to Gardner with the updated language attached does not contradict its previous assertion that it emailed the updates to Gardner. Her deposition testimony indicates that she previously received paper bank statements in the mail from Flagstar at the same address of record where Flagstar says it mailed the updated disclosure guide. ECF No. 105-3, PageID.2248. Further, Gardner was asked during her deposition if she recalled "receiving any notices from Flagstar of any changes to its [(her account's)] terms and conditions[.]". ECF No. 105-3, PageID.2251. "I don't remember[,]" she

responded. *Id*. Gardner also testified that she didn't remember if she received "anything in the mail hard copy from Flagstar with respect to overdraft charges." *Id*. The record does not affirmatively demonstrate that Flagstar sent Gardner an electronic communication containing a link to the December 2017 account statement. And her testimony does not effectively dispute Flagstar's assertion that it mailed the disclosure guide updates to her.

Gardner believes that a genuine issue of material fact exists because "Flagstar has not specified the date on which the letter or email was sent to [her]." *Id*., at PageID.2789. According to Gardner, if the updates were mailed after December 18, 2017, the date when she opted into paperless statements, then "such a mailing cannot demonstrate assent" because Gardner "had already refused her consent to paper mail delivery by this point and thus had no reasonable expectation of receiving important account disclosures in the mail." *Id*.

Contrary to Gardner's position, the Agreement expressly provides that Flagstar "may change any term of th[e] agreement . . . [W]e will give you reasonable notice, if required by law, in writing or by any other method permitted by law . . ." ECF No. 97-1, Page.ID 1967. Flagstar undisputedly provided written notice to Gardner, and she points to no provision of law that requires more. Thus, Gardner's argument—that the notice was unreasonable simply because it was provided in written correspondence after she had opted into paperless

communications—is without merit.

The Agreement further states that ". . . If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s)." *Id*. Pursuant to Michigan law, "a party alleging a modification of a contract 'must establish a mutual intention of the parties to waive or modify the original contract.'" *Bank of Am., NA v. First Am. Title Ins. Co*., 499 Mich. 74, 102, 878 N.W.2d 816, 830 (2016) (quoting *Quality Prods. & Concepts Co. v. Nagel Precision, Inc*., 469 Mich. 362, 372, 666 N.W.2d 251 (2003)). This requirement of mutual assent "is satisfied where a modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to modify or waive the terms of the original contract." *Quality Prod. & Concepts Co. v. Nagel Precision, Inc*., 469 Mich. 362, 365, 666 N.W.2d 251, 254 (2003). No allegation has been made that Gardner manifested her assent orally or in writing. Accordingly, the premier issue at stake regarding the updated disclosure guide notice is whether Gardner's assent to the modification has been established by her continued to use the account after receiving the purported notice.

Regarding mutual assent, Gardner suggests that "Flagstar's notice program" appears to "conceal its intent to unilaterally amend customers' original Account Agreements to their financial detriment." ECF No. 110, PageID.2789. As evidence

of Flagstar's alleged efforts to conceal amendments, Gardner points to the fact that "Flagstar does not send full copies of the revised versions of the Account Agreement to customers." *Id*. And she says that "Flagstar does not even inform customers, either in the Account Agreement or by any other means, that its practice is to append Disclosure Guide Updates to the end of account statements . . ." *Id*.

Gardner believes that "[c]ase law examining unilateral amendments to consumer banking agreements establishes that Flagstar's notice was required to direct reasonable customers' attention to an adverse change if it is to be legally binding.". *Id*., at PageID.2790. In support of this argument Gardner cites *Gibbs v. Firefighters Cmty. Credit Union*, 2021-Ohio-2679, ¶ 17, 18 N.E.3d 294, 299 (Ct. App. Ohio 2021).

In *Gibbs*, an overdraft fee class action, the Court of Appeals of Ohio found that notice and mutual assent were lacking where a credit union amended its banking agreement to include an arbitration clause and emailed notice of the amendment to customers. *Gibbs*, N.E.3d at 298. The email notice indicated that "[t]he changes in terms are attached to this email[;]" the court observed that "the language used by the defendants in the email implied that all members had already agreed to the updated terms." *Id*., at 299. (Internal citations omitted). The email notice also stated in the subject line, "We've updated our terms of services," but "the email did not call attention to the arbitration provision or opt-out

15

requirements." *Id*. Accordingly, the court held that "clear notice was not provided for [plaintiffs] to make an informed decision or to demonstrate they agreed to be bound by the arbitration provision." *Id*.  Instead, "[t]he Plaintiffs were . . . lulled into not giving a thought to the unilateral addition of the arbitration provision . . ." *Id*. at 300. Because "there [was] nothing to show that an arbitration provision was included in the original account agreement, and the content of the email notice . . . did not provide any indication that the changes to the account involved the addition of the [arbitration provision,]" the court concluded that "there was no meeting of the minds and no binding agreement to arbitrate." *Id*., at 299, 301.

*Gibbs* is distinguishable. There, the court disapproved of the arbitration clause amendment because it was not contemplated by the original agreement. As such, more was required to demonstrate that the credit union notified customers of the unilateral amendment and that they agreed to be bound by an arbitration clause. Here, however, the original agreement did contemplate the assessment of OD fees and NSF fees against customer accounts. Further, the updated language clarifies and explains the circumstances that could lead to an OD/NSF fee being assessed. It does not amend the contract to add new terms not previously contemplated by the parties. Accordingly, Gardner's mutual assent is established, the notice was reasonable, and the updated disclosure guide was effective.

The Court will discuss the updated disclosure guide's effect on Gardner's

claims.

> ### 2. Whether the Assessment of APPSN Fees and Item Presentment Fees Against Gardner's Account Constitute Breach of Contract Under the Updated Disclosure Guide

The updated disclosure guide provides definitions for the terms "Item," "Post", and "Temporary Debit Authorization Hold":

- "Item" **means any order, instruction or authorization to pay, transfer or withdraw funds or money from your account** including, but not limited to, checks substitute checks, preauthorized drafts, withdrawal tickets, transfers, electronic debits, imaged debits, wire transfers, ATM debits, ACH debits, bill pay debits, photocopy debits, bank generated debits, and debit card point of sale transactions . . . .

- "Post" means a debit, deposit, or other credit made to your account during our processing at the end of each Business Day**. For example, a debit to your account from a signature-based point-of-sale debit card transaction is not "Posted" until it is paid from your account (this is sometimes referred to as "settled" or a "settlement")** . . .

- "Temporary Debit Authorization Hold" means a hold on funds in your account resulting from a merchant's request to authorize a signature-based point-of-sale debit card transaction. **Temporary Debit Authorization Holds are not Posted transactions**.

ECF No. 105-5, PageID.2320 (emphasis added). The updated language clarifies that a transaction which creates a temporary debit authorization hold is an "item" that does not become "posted" to the account until after it is paid from the account. Thus, under the updated language, a temporary debit authorization hold is not a "posted" transaction.

The updates also include explanatory language regarding temporary debit authorizations holds and account overdrafts:

- Remember that we assess Overdraft and Non-Sufficient Funds Charges on an Item exceeding your Available Balance at the time the Item is presented for payment. **Just because your Available Balance was sufficient to cover a debit-card transaction at the time the Temporary Debit Authorization Hold was created does not mean it will be sufficient when the debit-card transaction is submitted to us for paymen**t.

- Example: Your account has an Available Balance of $100. You swipe your debit card at a merchant to buy $50 worth of groceries, and the merchant requests we create a Temporary Debit Authorization Hold for $50. This reduces your Available Balance to $50. Later that day, a check you wrote for $75 is presented to us for payment. Even though the check exceeds your Available Balance, we decide in our discretion to pay it, overdrawing your account by $25 plus an Overdraft Charge. **The next day, the merchant submits your $50 debit-card transaction for payment. We will pay the debit-card transaction (further overdrawing your account)**, and if you have specifically consented to us paying ATM and everyday debit card purchases as overdraft transactions, we will assess an Overdraft Charge.

ECF No. 105-5, PageID.232 (emphasis added).

As Flagstar points out, the disclosure guide updates clarify that, though "a customer's Available Balance may be positive at the time a Temporary Debit Authorization Hold is created (i.e., when the customer debits her account using a signature-based debit card transaction) . . . the customer may still incur an OD fee when the Temporary Debit Authorization Hold is removed and that same

18

signature-based debit card transaction is Posted, if her Available Balance is negative at the time the transaction settles." ECF No. 105, PageID.2182. "[P]er the plain language of the Agreement," Flagstar says, it "determines whether to assess an OD/NSF fee 'at the time the Item is presented for payment[,]'" not at initial authorization. *Id*., PageID.2192. Flagstar's interpretation of the Agreement is consistent with the written language. And Gardner's understanding of the agreement "to promise that OD Fees will not be assessed on APPSN transactions" is inconsistent with the explicit language of the Agreement. ECF No. 110, PageID.2784.

Other federal courts have interpreted agreements with similar language and rejected the argument that Plaintiff makes here. For example, Flagstar relies on *Boone v. MB Financial Bank*, N.A., 375 F.Supp.3d 987, 992-94 (N.D. Ill. 2019). There, the plaintiff alleged that MB Financial had breached checking agreements by charging OD fees on APPSN transactions. *Id*. The language of the contract contract instructed the customer to determine their "available balance" by "subtract[ing]," *inter alia*, ". . .transactions that we . . . have already paid out in cash, . . . other pending transactions such as ACH transactions, and . . . any holds on [the] balance, such as holds on funds to comply with court orders or other legal documents." *Id*.

Relying on this language, the plaintiff made an argument similar to

Gardner's, averring that the "underlying language allows MB Financial to solely assess OD fees on transactions with insufficient available funds to pay a given transaction and that the bank will immediately deduct or place a hold on her funds for [APPSN] transactions." *Id*. at 993.  Moving to dismiss, MB Financial argued that OD fees are assessed when it decides to pay for the transactions. *Id*. "[W]e agree with MB Financial's assertion[,]" the court noted, "this [deduction of funds] occurs when an APPSN transaction is presented for settlement." *Id*. The court's view of the contractual language, as applied to the facts of the case, established that, "[o]n the date MB Financial pays the transactions – the settlement date – there are 'insufficient available funds' because the customer in the interim has chosen to make additional, intervening payments from her account that caused it to have a negative balance." *Id*., at 993.

The *Boone* plaintiff also focused her claims on the Overdraft Disclosure, which stated that "[a]n overdraft occurs when you do not have enough money available in your account to cover a transaction, but we pay it anyway." *Id*. Boone argued, *inter alia*, that the term "pay" was ambiguous, preventing dismissal of her claims. *Id*. The Court disagreed, noting that "the Checking Agreements unambiguously provide that an OD occurs when MB Financial pays, and not merely authorizes, an amount in excess of Boone's available balance." *Id*., at 994.

Similar to *Boone*, here, the contractual language provides that a temporary

20

debit authorization hold is deducted from the available balance and the unambiguous terms indicate that OD fees are assessed when Flagstar pays a transaction that exceeds an account's available balance.

Flagstar also cites *McCollam v. Sunflower Bank, N.A*., 598 F. Supp. 3d 1104, 1110- 1111 (D. Colo. 2022). There, the overdraft disclosure similarly stated that "an overdraft occurs when there is not enough money in your account to pay for a transaction, but we pay (or cover) the transaction anyway." *Id*., at 1110. The Opt-in Form for the overdraft protection program stated that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." *Id*. In the court's view, these sections "unambiguously provide[d] that overdraft fees are assessed at the time Sunflower pays the transaction, not at the time Sunflower authorizes the transaction." *Id*. Thus, Sunflower's "decision to honor a debit-card transaction at the time of authorization does not mean that it determines whether to impose an overdraft fee at that point." *Id*. at 1111. Lastly, the court determined that the plaintiff's interpretation of the contractual provision was unreasonable because it suggested that OD fees were assessed at authorization, which was "in direct contradiction to the provisions of the contract discussed above [that] clearly provide [for] overdraft fees [to be] determined at payment." *Id*.

Similar to the contractual language in *McCollam*, here the Agreement unambiguously indicates that an OD fee is assessed only if Flagstar pays for an

item that exceeds the available balance. *See* ECF No. 97-1, PageID.1968. "Your account is overdrawn when your Available Balance is less than zero. One way this can happen is if we pay an Item for more money than your Available Balance. If we do, the transaction will be considered an overdraft transaction and your account will be considered overdrawn."). The contractual language focuses on the then existing available balance when an item is presented for payment. It provides that, if the available balance is insufficient at the time the item is presented for payment, then Flagstar will pay for the transaction first, and then assess an OD fee after it makes payment. If Flagstar does not pay for the item, it will assess an NSF fee instead of an OD fee.

In this way, a debit authorization made on an account with an insufficient available balance could result in an NSF fee if Flagstar declines to pay for the item, or an OD fee if Flagstar does pay for the item. Thus, under the Agreement, it is not a customer's authorization of a transaction on an account with an insufficient available balance that determines whether an OD fee will occur. Rather, it is Flagstar who decides to pay for the transaction, allow the account to be overdrawn, and then charge an OD fee as a result. Indeed, the updated disclosure guide clarifies that temporary debit authorization holds are not posted transactions and that a transaction is not posted until it is paid from the account.

Further, the updated language is reasonably interpreted to provide that

transactions made while an account has a temporary debit authorization hold could cause the account to be overdrawn if—at the time settlement occurs—an insufficient available balance exists, and Flagstar pays for the transaction anyway. The updated disclosure guide also provided a real-world example of how an account's available balance is affected by a temporary debit authorization hold. Plaintiff's interpretation of the contractual provision is unreasonable because it contradicts the language of the Agreement as a whole, including the updated disclosure guide.

Even if the Agreement were ambiguous though, Plaintiff's claim could not survive summary judgment. Under Michigan law, when a written contract is ambiguous, "a factual question is presented as to the meaning of its provisions, requiring a factual determination as to the intent of the parties in entering the contract." *Klapp v. United Ins. Grp. Agency, Inc*., 468 Mich. 459, 469, 663 N.W.2d 447, 454 (2003) (internal citations omitted). The "meaning of an ambiguous contract is a question of fact that must be decided by the jury." *Id*. Thus, "the fact finder must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning." *Id*. "In resolving such a question of fact, . . . the jury is to consider relevant extrinsic evidence." *Id*. It is well established as "a basic principle" in Michigan courts that "a party who has not read the contents of a

contract before signing it may not claim that his intention was different from that stated in the writing." *Pritts v. JI Case Co*, 108 Mich.App 22, 31; 310 NW2d 261 (1981) (*citing Komraus Plumbing & Heating Inc. v. Cadillac Sands Motel, Inc*., 387 Mich. 295, 289-291, 195 N.W.2d 865 (1972); see also *Collins v. Campbell*, No. 191661, 1997 WL 33348003, at *1 (Mich. Ct. App. May 27, 1997).

After the Court denied Flagstar's motion to dismiss, the parties engaged in Plaintiff-specific discovery. In her discovery deposition, Gardner was asked about discussions she had with bank staff at the account opening. Specifically, she was asked whether she had discussions with bank staff about "overdrafts or insufficient funds or how those would be handled in the event that it occurred." ECF No. 105-3, PageID.2241-42. She answered, "[n]o. Well, I don't remember. I don't want to say no. I don't remember." *Id*. Gardner was asked "did you rely on what was disclosed to you at that time you agreed to open the account?" *Id*., at PageID.2242. She said that she "relied on what was disclosed to her to be true to their word and that's not how they followed through at all." *Id*. "I relied on one fee per transaction[,]" she stated, "and I agreed to overdraft fees if there was insufficient funds in my account at the time, not overdraft fees, you know, whenever they feel like it." *Id*.

Flagstar points out that Gardner's testimony also suggest that she "glanced" or "skimmed over" the account opening agreement but did not "read" it and did not

remember reviewing any specific provisions related to OD/NSF fees. ECF No. 105-3, PageID.2242-43. However, Gardner did review the fee schedule; she testified that "I make it a habit to look for this part of the terms and conditions specifically because this is everything that I would need to know in regard[] to fees." ECF No. 105-3, PageID.2262. As the contractual language demonstrates, however, the fee schedule does not define the terms "Item," "post," or "temporary debit authorization hold." Gardner does not show that she reviewed any section of the contract that includes these terms.

Accordingly, Flagstar argues that "to the extent the Agreement is ambiguous, Plaintiffs' understanding of the Agreement is relevant. However, Plaintiffs lack any such understanding because they did not read the Agreement." ECF No. 105, PageID.2198. "Plaintiffs therefore may not plausibly claim to have a different interpretation of the Agreement's terms regarding an Item or the nature of Flagstar's processing of Temporary Debit Authorization Holds under the Agreement[,]" Flagstar says.

The sole argument Gardner advances in response is that the Agreement is a "form adhesion contract[,]" and therefore, "subjective understandings are irrelevant." ECF No. 110, PageID.2802. Notably, Gardner fails to say anything in her brief to cast her testimony in a different light and she does not suggest that she did in fact read any relevant language regarding "Items," "post," the "Available

25

Balance", or "temporary debit authorization holds," as discussed in the Agreement. Further, Gardner does not assert that she read the updated disclosure guide and she does not call into question the applicability of the principle stated in *Pritts* under Michigan law.

This is critical to Gardner's claim because the Agreement is not a contract of adhesion. Under Michigan law, Contracts of adhesion are "characterized by standardized forms prepared by one party which are offered for rejection or acceptance without opportunity for bargaining and under [] circumstances that the second party cannot obtain the desired product or service except by acquiescing in the form agreement." *High v. Cap. Senior Living Properties 2-Heatherwood, Inc*., 594 F. Supp. 2d 789, 799–800 (E.D. Mich. 2008) (citing *Morris v. Metriyakool,* 418 Mich. 423, 440, 344 N.W.2d 736, 742 (1984)). However, a contract is not one of adhesion where an individual has an option to obtain the desired goods or services elsewhere. *See Id*. Gardner switched her bank to JP Morgan Chase. ECF No. 105-3, PageID.2240. Because there is no suggestion that she was pressured into acquiescing to the OD/NSF fee policies, or that she was unable to find another bank, the record does not permit a finding that the Agreement is an adhesion contract.

Because Gardner cannot advance an interpretation to a contract that she did not read, the existing ambiguity regarding Item Presentment Fees cannot be

resolved in her favor. To the extent that Gardner asserts claims for APPSN fees charged against her account before the updated disclosure guide became effective, the ambiguity in the Agreement cannot be resolved in her favor because she did not read the Agreement as it existed before the updated disclosure guide became effective. Gardner therefore cannot advance a competing interpretation. Accordingly, Flagstar is entitled to summary judgment on Gardner's breach of contract claim.

### 3.  Breach of the Covenant of Good Faith and Fair Dealing

As part of her breach of contract claim, Gardner alleges that Flagstar violated the implied covenant of good faith and fair dealing. "Michigan does not recognize a separate cause of action for breach of an implied covenant of good faith and fair dealing apart from a claim for breach of the contract itself." *PTN-NRS, LLC v. Cnty. of Wayne*, No. 332135, 2017 WL 4447016, at *3 (Mich. Ct. App. Oct. 5, 2017); *Rodgers v. JPMorgan Chase Bank NA*, 315 Mich. App. 301, 311, 890 N.W.2d 381, 386 (2016) (citing *Belle Isle Grill Corporation v. City of Detroit*, 256 Mich. App. 463, 476; 666 N.W.2d 271 (2003). And "a lack of good faith cannot override an express contract provision." *Eastway & Blevins Agency v. Citizens Ins. Co. of America*, 206 Mich. App. 299, 303, 520 N.W.2d 640 (1994).

However, "the focus of the obligation of good faith is on the manner in

which the agreement or other duty is performed or enforced[;]" thus, "a breach of contract may be found where bad faith or unfair dealing exists in the performance of a contractual term when the manner of performance was discretionary." *PTN-NRS*, 2017 WL 4447016, at *3. (citing *Ferrell v. Vic Tanny Int'l, Inc.*, 137 Mich. App. 238, 243-44; 357 N.W.2d 669 (1984)). The covenant "is an implied promise that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id*.

Gardner alleges that Flagstar abuses contractual discretion by "consistently exercise[ing] this discretion to maximize fee revenue." ECF No. 110, PageID.2805. And "[w]hen it might authorize a transaction, precluding subsequent re-submission attempts from triggering Multiple Fees, it instead rejects the transaction." *Id*. It is true that Flagstar charges multiple NSF fees when an item is declined and resubmitted for payment. Without more, however, the record does not support the inference that Flagstar engaged in bad faith.

Gardner also argues that "when Flagstar might reject intervening transactions following an APPSN transaction, it instead authorizes them, ensuring that the original transaction will trigger a fee." ECF No. 110, PageID.2805. Again, this description of Flagstar's discretion under the contract cites no evidence that is demonstrative of bad faith.

Lastly, Gardner asserts that "Flagstar also abused its contractual discretion when it attempted to use its blanket 'change of terms' clause to impose a new fee on Plaintiffs in December 2017." *Id*., at PageID.2805. As stated *supra*, however, the OD/NSF fees were clearly contemplated by the original agreement, the updated disclosure guide explained those fees and defined certain terms that were pertinent to their application. Flagstar fails to demonstrate the existence of a genuine issue of material fact regarding the implied covenant of good faith and fair dealing. The Court will address Gardner's supplemental brief next.

## IV.   Gardner's Supplemental Brief

In her supplemental brief, Gardner asserts that "Flagstar's Aug. 1, 2023 Update clearly demonstrates that Flagstar is now interpreting its own Account Agreements regarding the imposition of APPSN in the exact same manner in which Plaintiffs have been arguing in this lawsuit for three years that language should be interpreted." ECF No. 132, PageID.4354.

Accordingly, she argues that "Flagstar cannot argue to this Court that it should interpret the APPSN contract language in a manner which is different not only than what Plaintiffs argue is correct, but also in a manner which is different than Flagstar itself now admits it is interpreting and practicing. Flagstar's own conduct defeats its argument." *Id*. And because Plaintiff seeks injunctive relief requiring cessation by Flagstar of the APPN fees, she believes that "this class

29

action lawsuit already has accomplished one of its purposes." *Id.* For this reason, Gardner argues that she may "eventually move for fees under the 'catalyst theory' that 'the lawsuit brought about a voluntary change in the defendant's conduct.'" *Id.* (citing *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Hum. Res.*, 532 U.S. 598, 601 (2001); and *Roberts v. Neace*, 65 F.4th 280, 285 (6th Cir. 2023).

The record does not demonstrate that Flagstar's Disclosure Guide Updates are an acknowledgement of wrongdoing or that it interprets the Agreement at issue in this case differently than previously asserted. Flagstar submits the Declaration of Meghan S. Davis, Flagstar's Compliance Partner Team Lead, Vice President. Davis declared that the Disclosure Guide Updates "were part of a larger change in Flagstar's overall product offering in connection with Flagstar's recent merger with New York Community Bancorp, Inc. in December 2022." ECF No. 133-1, PageID.4377.

Gardner urges the Court to consider the updates to show that Flagstar acknowledges wrongdoing and now interprets the agreement to be consistent with her position, making Flagstar liable for breach of contract. As Flagstar points out, however, "this is impermissible under the Federal Rules of Evidence." ECF No. 133, PageID.4371. "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not

admissible to prove . . . culpable conduct." Fed. R. Evid. 407. Because Gardner

offers the updates as inadmissible Rule 407 evidence, the Court will not consider

them. *See* Fed. R. Civ. P. 56 (c)(2) ("A party may object that the material cited to

support or dispute a fact cannot be presented in a form that would be admissible in

evidence.") and comments to Subdivision (c)(2) ("The burden is on the proponent

to show that the material is admissible as presented or to explain the admissible

form that is anticipated."). Gardner does not present the Disclosure Guide Updates

for an admissible purpose.

## V.    Conclusion

Flagstar's Motion for summary judgment is granted in its entirety.

### SO ORDERED.

Dated:  April 16, 2024                    /s/Gershwin A. Drain
                                          GERSHWIN A. DRAIN
                                          United States District Judge


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
April 16, 2024, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Deputy Clerk